UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

NOE PEÑA,

     Plaintiff,

                              CASE NO. 14-CV-13425

   v.                      HONORABLE GEORGE CARAM STEEH

CITY OF FLUSHING,

     Defendant.

_____/

## OPINION AND ORDER GRANTING DEFENDANT'S MOTION
## FOR SUMMARY JUDGMENT (DOC. #16) AND DISMISSING CASE

Plaintiff Noe Peña is a 57-year-old Mexican-American who was employed by the defendant City of Flushing as a wastewater treatment plant operator from 2004 until his termination on March 14, 2014. The City contends that Peña was fired for refusing to attend an independent medical examination with a psychologist after returning to work from an extended psychiatric medical leave of absence. Peña argues that he was fired in retaliation for complaining about national origin discrimination, because defendant "regarded him" as disabled, and in retaliation for exercising his rights under the Americans With Disabilities Act (ADA), 42 U.S.C. §§ 12112 *et seq.*, and Title VII. Now before the court is defendant's motion for summary judgment (Doc. #16). The court heard oral argument on September 3, 2015. For the reasons that follow, the motion will be granted.

### I. BACKGROUND

The facts below are taken in a light most favorable to Peña.

-1-

Peña began his employment with the City of Flushing in September 2004. He was hired by Dennis Bow, the City manager, as a wastewater treatment plant operator, and supervised by Doug Parkinson. (Pl's. Dep. 27:25-28:4; 29:8). Although Peña did not have any formal education or training, his prior experience with water pumps for the United States Marine Corps "translate[d] to the civilian life as a wastewater treatment plant operator and supervisor." (*Id.* 28:5-18). Peña's job duties as a plant operator for the City included "[r]eading meters and ensuring that the wastewater treatment plant was running according to specifications." (*Id.* 30:21-25). *See also* (Doc. #20-12 & 20-13)

**A. Harassment And Medical Leave In 2008**

As an employee of the wastewater treatment plant, Peña sometimes interacted with employees of the department of public works (DPW). (Pl's. Dep. 32:21-33:4). Sometime in 2007 or 2008, Peña says a DPW employee named Mark began discriminating against him because of his national origin. (*Id.* 32:10-16). Peña recalled an incident where Mark was speaking with two of Peña's co-workers, and, when Peña approached them, Mark said, "I smell Mexican shit." (*Id.* 33:20-25). Mark would also make comments about tacos when referring to Peña. (*Id.* 34:2-5). Peña reported Mark's actions to Ed Sullivan, who was his co-worker and the union chairman, and to his supervisor Parkinson. (*Id.* 35:12-21).

In early 2008, shortly after the comments from Mark, Peña began having problems at work. On January 18, 2008, Peña received a verbal warning from Parkinson for failing to open a sludge valve the prior day. (*Id.* 38:17-39:3). A week later, on January 25, 2008, Parkinson issued Peña a written reprimand for leaving the drive unit off for the south final clarifier when he was checking the oils the previous day. (*Id.* 39:8-11). Peña attributes the work problems he experienced to the harassment he was suffering.

-2-

Experiencing problems with his work performance, Peña started treating with Dr. Pope, a therapist at Oakland Psychological Clinic. (*Id.* 40:1-3). Peña treated with Dr. Pope at least until March 2008. (*Id.* 44:13-15). Dr. Pope prescribed Peña medications for his anxiety and stress.

The problems eventually led Bow to place Peña on paid medical leave. On February 19, 2008, Bow sent a letter to Dr. Pope advising her that "[d]uring the past three weeks, certain conversations and actions have prompted the City of Flushing . . . to place Mr. Pena on paid leave until he is able to provide the city with a report from his doctor or therapist that he is capable of performing his duties, as required, so that his and his fellow employees' safety, is not compromised." (Doc. #16-3). Subsequently, on February 28, 2008, while Peña was out on paid leave, the City required all employees to attend an educational program regarding respect and responsibility in the workplace. (Pl's. Dep. 46:4-5). Peña was cleared by his treating doctors and he returned to work on March 25, 2008. (*Id.* 16-21).

After returning to work, Peña filed a formal complaint about the harassment he was suffering from his co-workers. (*Id.* 36:1-3). His co-workers caught wind of the formal complaint and were not happy. Peña explained at his deposition:

> When people found out that I had made this discrimination claim about Mark, one of the co-worker[']s that I worked for, which was Ted Thomas, he told me, you know, that, "You're gonna make a lot of people angry, you know, if we have to take classes on harassment." And I told him, you know, "If anything, these classes will – you know, will be good."
>
> He says, "No, because it's like you are accusing the rest of us of all this." I said, [w]ell, that's not my intentions."
>
> After that, things just went crazy. Those two, Ted and Ed, became friends and the retaliation just got worse and worse.

(*Id.* 36:20-37:7).

As a result of continued harassment from his co-workers, Peña was having a difficult time at work. (*Id.* 44:23-25). This led Peña to take a two-week medical leave on April 17, 2008, returning to work on May 12, 2008. (*Id.* 46:16-47:4). By May 20, 2008, however, Peña reported to his psychologist that things were better at work. (*Id.* 47:8-11). Moreover, on August 29, 2008, Bow met with Peña and the co-workers who were harassing him. Bow's notes from the meeting, which Peña agrees are accurate, stated that he "talked with Eddie and Doug and Noe, who all agreed things were going much better between them now." (*Id.* 47:16-25). At his deposition, Peña testified that "things weren't completely resolved[.] [T]hey were much better. There were still things that were . . . going on." (*Id.* 48:1-3).

### B. Issues Beginning At Work Again In 2012

In mid-2012, Peña began experiencing trouble breathing. Peña took medical leave from June 14, 2012 through August 31, 2012, for respiratory issues. (*Id.* 57:1-5). The City suspected Peña was getting sick from cleaning the clarifiers at the plant, but Peña suspects it was from cleaning the wet well with a water hose. (*Id.* 58:2-7; 81:23-82:10). Peña was the only employee at the time responsible for cleaning the clarifiers. Peña was given a mask to wear when he returned to work but that did not help the problem.

A year later, in July 2013, Peña took medical leave again, this time for stress Peña attributes to "discrimination" and "retaliation" at work. Peña explained at his deposition that he was distracted at work because of stress. (*Id.* 82:19-22). He visited his primary care physician, who referred him to see a psychologist. (*Id.* 82:23-25). Peña visited Dr. Vora at Oakland Psychological Clinic in August 2013 "[b]ecause [he] was being discriminated

and retaliated [against], and the stress that came from that was too severe for [him] to say at work." (*Id.* 19:1-6). Plaintiff also treated with a counselor at Oakland Psychological, Dianne DeWolley. (*Id.* 83:3-4). In a "Patient Progress Note" from Oakland Psychological Clinic dated August 14, 2013, it was noted that Peña had a depressed mood and self-deprecation. (Doc. #16-6 at 2). It was also noted that Peña had guilt regarding the death of a co-worker, and that he took the prior day off of work because of an inability to focus. (*Id.*). A note from Dr. Vora dated August 20, 2013, states: "Above pt was seen today. He needs to be on sick leave From 8/21/13 to 9/20/13. Return to work 9/30/13." (Doc. #16-7). In a subsequent note dated September 26, 2013, Dr. Vora stated, "Above pt needs to continue sick leave up to 10/27/13. Return to work 10/28/13." Peña testified at his deposition that Dr. Vora continued the sick leave because of the side effects Peña was experiencing from trying new medications. (Pl's. Dep. 120:24-121:1).

Peña was prescribed Xanax, Abilify and Latuda to control his depression and anxiety, all of which had side effects. (*Id.* 84:3-11). The prescription drugs caused Peña to hallucinate and he had trouble breathing. (*Id.* 84:20-85:3).

Peña elaborated at his deposition about the "discrimination" and "retaliation" that stressed him out and caused him to seek medical treatment in July 2013. Peña testified that the stress was a result of the issues arising from cleaning the clarifiers, the fact that he was not permitted to plow the snow anymore, that he was not being given the opportunity for overtime like his co-workers, and that he was not given a key to the DPW even though his co-workers were. Peña explained each act that he claimed to be discriminatory or retaliatory in further detail.

-5-

*First*, Peña contends that when the lock was changed to the door at the DPW, he was not given a new key from his supervisor. (*Id.* 66:2-6). However, Peña concedes that his supervisor told him that he could request a key from the DPW director. (*Id.* 66:10-11). *Second*, Peña says he used to be able to mow the lawn and plow the snow using the riding lawn mower, but Parkinson took him off of that duty and only permitted him to use the push mower when he mowed the lawn occasionally. (*Id.* 66:23-67:14). Parkinson told Peña that he liked to do the mowing and snow plowing himself. (*Id.* 68:22). *Third*, Peña testified that he was never given an opportunity for overtime, an issue that he filed a grievance over, with the grievance being denied. (*Id.* 69:2-9). *Fourth*, Peña contends that he was not placed on the list of persons who could fill the City's trucks and equipment with gasoline. (*Id.* 71:8-11). Every time he needed gas, Peña says he had to go to Parkinson to get it for him. (*Id.* 71:21-25). *Fifth*, Peña states that he was the only one warned that he had to wear a mask when coming into contact with the clarifiers. (*Id.* 76:14-17). However, Peña concedes that he was the only one who developed an illness related to pulmonary problems at the plant and the only person responsible for cleaning the clarifiers. (*Id.* 76:20-22).

Peña further explained:

Q      Well, you indicated the combination of these items that you listed were a distraction to you. What about being distracted made you go on medical leave?

A      Well, we were shorthanded as it was. I felt that it got to a point where I was – because we were shorthanded, I was being – I was given too many tasks to do at one time. I felt responsible, that I needed to do all those things that, you know, that were given to me. But these other distractions were, in my opinion, becoming a problem. And before they became a problem, I wanted to take care of the problem by seeking help.

-6-

(*Id.* 62:20-63:16). When the problems piled up at work, Peña noticed himself "drinking a little more. I drink – I don't normally drink alcohol. But I started tasting alcohol, mainly ice in a glass, lots of ice. I would fill it up with ice." (*Id.* 64:12-15).

At the beginning of his sick leave, on August 21, 2013, Peña met with Bow to turn in his doctor's note and to explain to Bow why he was taking medical leave. (*Id.* 91:12-92:3; 96:17-21). Peña told Bow that he felt he was being treated unfairly and unequally. According to Peña, he says Bow tried to get Peña to agree to a transfer, but Peña told Bow to "fix the problem." (*Id.* 91:17-21). Peña says that Bow agreed to "take care of the problem." (*Id.* 92:1-3). Bow's version of the meeting is different. Bow says that, during the meeting, Peña was "obsessing on a lot of the issues that he was talking about, that [his co-workers] don't like him." (Bow's Dep. 40:1-3). However, when Bow would ask Peña a question, "[h]e wouldn't tell [Bow] what he meant by the allegations that he was making." (*Id.* 40:5-7). Bow explained:

> But the discussion I said was very labored because it was – He was not finishing his sentences, he was not putting paragraphs together. And something told me something was wrong at the time.
>
> And, in fact, at one point in the discussion after we had talked for – tried to talk for a while, he giggled and said – And he apologized for not – because he had not taken his medications that day.
>
> And I didn't know he was on medications at the time and I didn't know he needed them. And I became very concerned at that point that – Because I didn't know what medications he was on or what they were treating him for. I had no idea before that discussion.
>
> So that discussion was a big concern for me because of his lack of ability to communicate and really tell me what was bothering him.

(*Id.* 40:12-41:2). Bow testified that, through the discussion with Peña, he learned that Peña was treating for depression.

-7-

Sometime before October 24, 2013,[1] Peña also met with Bow and union stewards to discuss grievances that Peña had filed related to not being chosen for overtime, not being allowed to snowplow, and related issues. (Pl's. Dep. 100:10-17). Eventually, all of Peña's grievances were denied and the union declined to arbitrate any issues on his behalf.

On October 24, 2013, after being out on medical leave since August, Peña sent a text message to Parkinson informing Parkinson that he would be returning to work on October 28, 2013. (*Id.* 87:9-12). The following day, Peña received a letter from Bow on City letterhead dated October 24, 2013:

> Dear Mr. Pena,
>
> Due to the nature of your extensive leave from work, the city will require a medical clearance before your return to work.
>
> Upon clearance from your doctor, you are hereby directed to contact Dr. Linda Forsberg at PSYBUS PC . . . for an evaluation. The individual to contact at this facility is Shawn Williams. . . The city reserves the right to require a physical examination upon the conclusion and possible clearance for return to work from Dr. Forsberg.
>
> If you have any difficulty reaching their office at this number, please contact me for further direction.
>
> Respectfully yours,
>
> Dennis J. Bow
> City Manager

(Doc. #16-11).

On October 29, 2013, Bow sent a letter to Dr. Forsberg, a licensed psychologist:

> Dr. Linda Forsberg,

---

[1] The City contends that this meeting did not take place before October 24, 2013, but the facts are taken in a light most favorable to Peña.

-8-

Mr. Pena has been sent to your office for concerns involving his mental and physical health while being employed with the City of Flushing.

During the last two years, he has taken over four months off from work, mostly in the summer.  Initially, Noe complained of pulmonary symptoms that were affecting his breathing.  A cold turned into the "Flu" in June of 2012, and he was out of work for the next two and one-half months.  The city did not challenge his condition with any follow up, but did welcome him back to work in the fall.

This year, Mr. Pena has taken off of duty due to a psychological reason that is unknown to the city.  We are now asking for a psychological evaluation before returning him to another position.

Mr. Pena has worked for the city in the area of the wastewater plant for over eight years.  Due to a problem that has been reported . . . with the air quality at the plant, I intend to assign him to a duty within the Department of Public Works, but outside the wastewater plant.  I am concerned that he may have <u>issues with the transfer</u> but we do not wish Mr. Pena to experience additional physical problems with the plant.  He is not yet aware of the pending transfer.

* * * *

Mr. Pena and I had a discussion in August of 2013, where he identified a number of small issues that were bothering him.  He seemed overly sensitive to these issues that were unrelated to the breathing problems that he experienced.   Due to those discussions, I am concerned that his psychological conditions may be more extensive than we thought.

-9-

Please contact me with any questions.

Respectfully yours,

Dennis J. Bow
City Manager

(Doc. #20-11) (emphasis in original).

Peña reported to Dr. Forsberg for a fitness-for-duty examination on October 31, 2013. (Pl's. Dep. 141:23-25). However, Peña was never examined because he requested additional time to consult with his attorney before giving Dr. Forsberg informed consent to complete the examination. (Doc. #16-12 at 4). Peña felt suspicious of Bow's letter to him requiring him to be examined by Forsberg. (Pl's. Dep. 126:10-13). Upon further online research of Dr. Forsberg, Peña read bad reviews about her that stated, "Do not trust this lady" and "They lost my records." (*Id.* 126:14-18). Peña believed that Dr. Forsberg's evaluation would be prejudiced against him. (*Id.* 147:4-8).

Peña filed a grievance on October 30, 2013 demanding management to stop discriminating against him by not allowing him a rotation of overtime and to allow him to return to work immediately. (*Id.* 137:25-138:5). Peña was told again on December 9, 2013 to schedule an appointment with Dr. Forsberg; he scheduled and cancelled a January 13, 2014 appointment with Dr. Forsberg. In a letter dated January 17, 2014, accompanying a letter sent by Peña to Bow, DeWolley and Dr. Vora informed Bow that "Mr. Pena has received therapy through Oakland Psychological Clinic at various times over the past few years," and that "a diagnosis of Major Depression was made." (Doc. #16-3). The letter further states:

> Mr. Pena was . . . referred for a Psychiatric Evaluation with Nikhil Vora, M.D. Mr. Pena reports compliance with the medications prescribed and symptom reduction is noted.
>
> Efforts in therapy have been focused on stress management training, the development of effective problem solving strategies, and cognitive restructuring.  Mr. Pena has been engaged and cooperative throughout the therapy process and following a review of his position summary, he appears capable of performing the duties required of him at the wastewater treatment plant without accommodation.

(*Id.*).  Peña requested that the City allow him to return to work immediately, and, if the City "percieve[d] that [he is] unable to perform [his] position. . . specify what aspect of that condition [the City] believe[s] renders [him] unable to perform the skills and physical requirements of [his] job."  (Doc. #20-14).

Bow responded to Peña in a letter dated January 14, 2014.  The letter states, in pertinent part:

> The basis for your extended leave from mid-August until late October is still unknown to the City, therefore the City is unable to identify any potential limitations or concerns about your ability to return to work as you have requested.  Nor have you demonstrated that your physician is apprised of your job requirements such that he may make an informed decision regarding your ability to perform the essential functions of your position. Accordingly, the City has asked that you submit to an examination by Psybus' Dr. Linda Forsberg—at the City's expense—to ascertain whether you are presently able to perform the essential functions of your job, with or without reasonable accommodation.
>
> Following Dr. Forsberg's assessment and report to the City, I would very much like to discuss with you the extent to which any reasonable accommodations are required to enable you to return to work and which will be effective and sensible for both you and the City. . . I truly believe it is in the best interest of all involved to have a third party evaluate you and provide an unbiased report regarding your ability to perform the essential functions of your job with or without accommodations.

(Doc. #16-14).

-11-

Peña took no action to schedule an independent medical examination with Dr. Forsberg despite the City's repeated directions to schedule an appointment.  He was terminated in a letter from the City dated March 14, 2014.  The reason stated for his termination was Peña's refusal to schedule an independent medical examination with Dr. Forsberg.  Bow informed Peña, "[y]our refusal to follow a direct order from your superiors is considered insubordination.  In accordance with Section five of article VI of the AFSCME contract, insubordination is a cause for dismissal." (Doc. #16-15).  The letter further states, "[a]s you have not returned to work with the proper clearance for fitness of duty that is acceptable to the city, and since the insubordinate actions continue to impair employment expectations, your employment with the City of Flushing is hereby terminated."  (*Id.*).

Peña filed two complaints against the City with the Michigan Department of Civil Rights — the first for refusing to allow him to return to work from a leave of absence and the second for terminating him.  The complaints were dismissed for a lack of evidence.  Peña also  filed two complaints with the Equal Employment Opportunity Commission (EEOC).  The EEOC concluded that the evidence did not support Peña's allegations of unlawful discrimination and issued him two right to sue letters on June 6, 2014 and October 21, 2014.  The complaint was timely filed within 90 days of receiving the first right to sue letter and amended to add the claims related to his termination after receiving the second right to sue letter.

## II. LEGAL STANDARD

Federal Rule of Civil Procedure 56(c) empowers the court to render summary judgment "forthwith if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any

material fact and that the moving party is entitled to judgment as a matter of law." *See Redding v. St. Eward*, 241 F.3d 530, 532 (6th Cir. 2001). The Supreme Court has affirmed the court's use of summary judgment as an integral part of the fair and efficient administration of justice. The procedure is not a disfavored procedural shortcut. *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986); *see also Cox v. Kentucky Dep't of Transp.*, 53 F.3d 146, 149 (6th Cir. 1995).

The standard for determining whether summary judgment is appropriate is "'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" *Amway Distrib. Benefits Ass'n v. Northfield Ins. Co.*, 323 F.3d 386, 390 (6th Cir. 2003) (*quoting Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986)). The evidence and all reasonable inferences must be construed in the light most favorable to the non-moving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Redding*, 241 F.3d at 532 (6th Cir. 2001). "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson*, 477 U.S. at 247-48 (emphasis in original); *see also Nat'l Satellite Sports, Inc. v. Eliadis, Inc.*, 253 F.3d 900, 907 (6th Cir. 2001).

If the movant establishes by use of the material specified in Rule 56(c) that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law, the opposing party must come forward with "specific facts showing that there is a genuine issue for trial." *First Nat'l Bank v. Cities Serv. Co.*, 391 U.S. 253, 270 (1968); *see also McLean v. 988011 Ontario, Ltd.*, 224 F.3d 797, 800 (6th Cir. 2000). Mere allegations or denials in

-13-

the non-movant's pleadings will not meet this burden, nor will a mere scintilla of evidence supporting the non-moving party. *Anderson*, 477 U.S. at 248, 252. Rather, there must be evidence from which a jury could reasonably find for the non-movant. *McLean*, 224 F.3d at 800 (citing *Anderson*, 477 U.S. at 252).

### III. ANALYSIS

Plaintiff's amended complaint alleges violations of the ADA and Title VII. The court considers the claims in turn.

### A. The ADA Claims

Peña alleges that the City violated the ADA by (1) requiring him to undergo an independent medical examination ("IME") that was not job related or consistent with business necessity as a condition of returning from his medical leave and ultimately discharging him for failing to attend the examination; (2) failing to permit him to return to work from his medical leave and ultimately discharging him because of a perception that he was disabled; (3) failing to permit him to return to work and ultimately discharging him in retaliation for exercising his rights under the ADA. The City is entitled to summary judgment on these claims.

### 1. There is no evidence that the City perceived Peña to be disabled

The City argues that Peña is not a "disabled person" as defined by the ADA. Peña responds that the City perceived him to be disabled, and, therefore, the ADA applies to his claims. Peña is mistaken.

The ADA prohibits discrimination "against a qualified individual with a disability because of the disability of such individual." 42 U.S.C. § 12112(a). Disability is defined as:

**(A)** a physical or mental impairment that substantially limits one or more major life activities of such individual;

**(B)** a record of such an impairment; or

**(C)** being regarded as having such an impairment (as described in paragraph (3)).

42 U.S.C. § 12102(1).  The ADA further elaborates:

An individual meets the requirement of "being regarded as having such an impairment" if the individual establishes that he or she has been subjected to an action prohibited under this chapter because of an actual or perceived physical or mental impairment whether or not the impairment limits or is perceived to limit a major life activity.

42 U.S.C. § 12102(3)(A).

Peña argues that the City regarded him as having an impairment.  Specifically, Peña contends that Bow knew about his depression and medical treatment, including his use of prescription drugs, which led Bow to direct that Peña attend an IME.  Indeed, Peña argues that Bow regarded him as disabled as early as 2008 when he required Peña to provide a report from his doctor or therapist that he could perform the essential duties of his job.  Unfortunately for Peña, none of this evidence supports the view that the City regarded him as having an impairment.

The Sixth Circuit addressed a similar argument in *Kocsis v. Multi-Care Management, Inc.*, 97 F.3d 876, 885 (6th Cir. 1996).  In *Kocsis*, the plaintiff argued that her supervisors knew that she was having health problems and that she personally believed herself to suffer from multiple sclerosis.  *Id.* at 886.  The plaintiff averred that, armed with this knowledge, her supervisors "viewed her activities as being substantially limited," and,

therefore that they perceived her as having an impairment.  The Sixth Circuit disagreed explaining:

> In our view, however, there is virtually no evidence to support [plaintiff's] position.  Kocsis' performance evaluations reveal that the defendant was aware of her health problems, lack of energy, and mood swings.  While the defendant may have perceived that Kocsis' health problems were adversely affecting her job performance, there is no evidence that defendant regarded Kocsis as being unable to care for herself or to perform all the duties of her job.  Therefore, Kocsis cannot establish that she had a disability under the "regard as" prong of the definition.

*Id.*

In another case, *Sullivan v. River Valley School District*, 20 F.Supp.2d 1120, 1123 (W.D. Mich. 1998), the plaintiff teacher's supervisor sent a psychologist letters, claims and grievances that related to the plaintiff and asked the psychologist to conduct an informal assessment of the plaintiff.  The psychologist assessment — which concluded that the plaintiff appeared to be struggling with a possible psychiatric disorder warranting further investigation — was shared with the school board for a determination of whether plaintiff should be ordered to submit to physical and mental examinations.  *Id.*  The plaintiff argued that, by sharing the psychologist report with the school board, his supervisor created the perception that he was unstable.  *Id.* at 1125.  The district court disagreed, explaining that "Defendants' concern for Plaintiff's mental condition and their request for further inquiry into Plaintiff's mental condition, are not a sufficient basis from which to infer that they perceived Plaintiff as disabled."  Rather, "Defendants needed to ascertain the cause of Plaintiff's troubling behavior."  *Id.*

-16-

The Sixth Circuit affirmed the district court's decision in *Sullivan*. 197 F.3d 804 (6th Cir. 1999). Addressing the plaintiff's argument that he was perceived as suffering from an impairment, the Sixth Circuit explained:

> Sullivan's evidence that his employer treated him as impaired is that his employer asked him to undergo mental and physical examinations to determine his fitness as a teacher following his allegedly exhibiting some unusual behavior. Given that an employer needs to be able to determine the cause of an employee's aberrant behavior, this is not enough to suggest that the employee is regarded as mentally disabled. As the district court ably explained, a defendant employer's perception that health problems are adversely affecting an employees job performance is not tantamount to regarding that employee as disabled.

> \* \* \* \*

> A request that an employee obtain a medical exam may signal that an employee's job performance is suffering, but that cannot itself prove perception of a disability because it does not prove that the employer perceives the employee to have an impairment that substantially limits one or more of the employee's major life activities. . . [T]he inability to perform a single, particular job does not constitute a substantial limitation in the major life activity of working. A *fortiori*, a mere deterioration in performance at a single, particular job cannot constitute a disability. Just as requesting a mental evaluation does not indicate that an employer regards an employee as disabled, so too expressing concern over an employee's job performance does not show that an employer regards an employee as having a disability that substantially limits a major life activity. Sullivan simply has not provided evidence sufficient to show that his employer regarded him as disabled.

*Id.* at 810–11 (internal citations omitted).

Peña's arguments are similar to the arguments rejected in *Kocsis* and *Sullivan*. Bow's knowledge that Peña suffered from depression, had taken medical leave in the past and was obtaining psychological treatment, is insufficient on its own to establish that Bow perceived Peña as suffering from an impairment. Nor does Bow's directive that Peña undergo an IME establish that Bow perceived Peña as suffering from an impairment. Bow was concerned that Peña was out on medical leave for over two months based on a

-17-

psychologist's simple note stating, "Above pt was seen today.  He needs to be on sick leave."  Moreover, when Bow talked to Peña when he initially began his sick leave, Bow was concerned with Peña's demeanor and response to questions.  Like *Kocsis* and *Sullivan*, Peña has failed to establish a genuine issue of material fact that Bow regarded him as disabled.  The City is entitled to summary judgment on the ADA claims.

> **2.  Even if the City perceived Peña to be disabled, the City was justified in requiring Peña to attend an IME because objective evidence called into question Peña's ability to perform the essential functions of his job**

Peña argues that the City violated the ADA by conditioning his return to work on obtaining an IME with Dr. Forsberg, and retaliating against him (ultimately terminating him) for exercising his rights under the ADA (refusing to attend the IME).  However, the City was entitled to request that Peña undergo an IME with Dr. Forsberg.  Thus, even if Peña had established that the City perceived him to be disabled, the City is entitled to summary judgment on the ADA claims.

The ADA distinguishes between "prohibited examinations and inquiries" and "acceptable examinations and inquiries":

> (A) Prohibited examinations and inquiries
>
> A covered entity shall not require a medical examination and shall not make inquiries of an employee as to whether such employee is an individual with a disability or as to the nature or severity of the disability, unless such examination or inquiry is shown to be job-related and consistent with business necessity.
>
> (B) Acceptable examinations and inquiries
>
> A covered entity may conduct voluntary medical examinations, including voluntary medical histories, which are part of an employee health program

-18-

available to employees at the work site.  A covered entity may make inquiries into the ability of an employee to perform job-related functions.

42 U.S.C. §§ 12112(d)(4)(A)-(B).

Under the ADA, "employees can be instructed to undergo medical examinations by employers only 'in certain limited circumstances,' confined by the 'job-relatedness' and 'business necessity' requirements." *Kroll v. White Lake Ambulance Authority*, 691 F.3d 809, 815 (6th Cir. 2012) ("*Kroll I*") (citing *EEOC v. Prevo's Family Mkt., Inc.*, 135 F.3d 1089, 1094 (6th Cir. 1998)).  Limiting the circumstances allowing for medical examinations "reflect[s] Congress's intent to protect the rights of applicants and employees to be assessed on merit alone, while protecting the rights of employers to ensure that individuals in the workplace can efficiently perform the essential functions of their jobs." *Id.* (quotation marks and citation omitted).

"The employer bears the burden of proving that a medical examination is job-related and consistent with business necessity by demonstrating that '(1) the employee requests an accommodation; (2) the employee's ability to perform the essential functions of the job is impaired; or (3) the employee poses a direct threat to himself or others.'" *Kroll v. White Lake Ambulance Authority*, 763 F.3d 619, 623 (6th Cir. 2014) ("*Kroll II*") (quoting *Denman v. Davey Tree Expert Co.*, 266 F. App'x 377, 379 (6th Cir. 2007)).  "[T]he individual who decides to require a medical examination must have a reasonable belief based on objective evidence that the employee's behavior threatens a vital function of the business." *Id.* (citations omitted).

Here, the City's request that Peña attend an IME with Dr. Forsberg before returning to work was permitted because the objective evidence available to the City showed that the

City had concern whether Peña's ability to perform the essential functions of his job was impaired. In determining whether an employee's ability to perform his essential job functions is impaired, the employer must point to a "genuine reason to doubt whether that employee can perform job-related functions." *Kroll II*, 763 F.3d at 624 (citation and internal quotation marks omitted). "Such a genuine reason may arise when an employee's 'aberrant behavior' raises the concern that an employee's mental or emotional instability could undermine her ability to complete her job functions effectively in the employer's work environment." *Id.* at 624–25 (citations omitted).

In this case, Bow had a conversation with Peña when he left on medical leave and he learned that Peña was stressed out and suffering from depression. Bow observed Peña's demeanor and incoherent responses to questions during this meeting. Moreover, although Peña was supposed to return to work from the medical leave on September 20, 2013, Bow provided a one-sentence note from Dr. Vora as it got closer to his return date: "Above pt needs to continue sick leave up to 10/27/13. Return to work 10/28/13." There was no reasoned explanation in Dr. Vora's note. Based on this objective evidence, Bow was justified in requiring Peña to undergo an IME before returning to work. Bow had a genuine reason to believe that Peña's mental and emotional instability may have undermined his ability to complete his job functions effectively.

Instead of attending the IME as directed by Bow, Peña provided Bow with a letter from DeWolley and Dr. Vora stating that "it appears" that Peña was able to perform his duties at the wastewater plant. However, Bow had the right to seek an IME to obtain an unbiased opinion. More significantly, the note provided by Peña did not unequivocally opine that he was able to perform his job duties. It stated only that "it appears" that Peña

-20-

was able to perform his job duties.  Providing the note to Bow did not relieve Peña of his responsibility to undergo an IME.

Moreover, although Peña challenges the fact that Dr. Forsberg did not have his job description at the time she was requested to determine if he could perform his job duties, "[s]ince [he] never submitted to the examination[], he precluded himself from being able to establish a genuine issue of material fact as to whether the exam[] w[as] related to his job, or w[as] too broad in scope." *Sullivan*, 197 F.3d at 812.

In short, Bow was justified in directing Peña to undergo an IME with Dr. Forsberg as a precondition to returning to work.  *Sullivan*, 197 F.3d at 812 ("This court has upheld requiring mental and physical exams as a precondition to returning to work.") (citing *Pesterfield v. TVA*, 941 F.2d 437–38 (6th Cir. 1991)).  Peña's ultimate termination for insubordination as a result of his refusal to attend an IME is also justified.  *Id.* ("We have also upheld a finding of insubordination for refusing to submit to such exams.") (citing *Moore v. Bd. of Educ. of Johnson City Schs.*, 134 F.3d 781, 783 (6th Cir. 1998)).  For these reasons, the City is entitled to summary judgment on the ADA claims.[2]

**B. The Title VII Claims**

Peña also alleges that the City violated Title VII in refusing to allow him to return from his medical leave and ultimately terminating him based, in part, on his national origin

---

[2] Because the court determines that the City did not violate the ADA in requiring Peña to attend an IME based on the objective evidence establishing that his ability to perform the essential functions of his job was impaired, the court does not reach the City's argument that the IME was justified because Peña posed a "direct threat" to himself and others.

and race, and in retaliation for complaining about discrimination in the workplace. Peña

dedicates a single paragraph in his response brief to the Title VII claims:

> There is no dispute that Pena complained of racial and national origin harassment in 2008 and 2013. Indeed, Dennis Bow acknowledged that Pena was complaining of discrimination and harassment during their August 2013 meeting. Defendant insists, however, that the practice of referring Pena to a mental health practitioner in response to his formal filing of discrimination complaints cannot constitute illicit discrimination in violation of federal and state law. Defendant cites no authority in support of this argument, and provides no basis for granting summary judgment.

(Pl's. Resp. Br. at 13).

To establish a prima facie case of discrimination based on circumstantial evidence,[3]

the familiar *McDonnell Douglas* burden shifting framework applies. Thus, plaintiff bears the

burden of establishing a prima facie case of national origin and race discrimination by a

preponderance of the evidence. *Idemudia v. J.P. Morgan Chase*, 434 F. App'x 495,

500–01 (6th Cir. 2011). This requires the plaintiff to demonstrate that "(1) he is a member

of a protected class; (2) he was terminated; (3) he was qualified for the position; and (4) he

was replaced by a person outside a protected class or was treated differently than a

similarly situated, non-protected employee." *Abdulnour v. Campbell Soup Supply Co., LLC*,

502 F.3d 496, 501 (6th Cir. 2007) (citation omitted). If the plaintiff establishes a prima facie

case of discrimination, the burden shifts to the defendant to articulate a legitimate, non-

discriminatory reason for the adverse employment action. *Id.* at 502. Once the employer

establishes a non-discriminatory reason for the adverse employment action, the burden

shifts back to plaintiff to prove by a preponderance of the evidence that the reasons offered

by the defendant were pretext for discrimination. *Id.* Title VII retaliation claims are

---

[3] Peña does not argue that direct evidence supports his claims.

-22-

analyzed under this same burden-shifting framework. *Imwalle v. Reliance Medical Prods., Inc.*, 515 F.3d 531, 544 (6th Cir. 2008)

Here, assuming without deciding that Peña could establish a prima facie case of discrimination and retaliation under Title VII, the City has articulated a legitimate, non-discriminatory reason for refusing to allow Peña to return to work and ultimately terminating him — insubordination. As explained above, despite Bow's directive, Peña did not submit to an IME with Dr. Forsberg after being out on medical leave for over two months.

Peña fails to meet his burden in establishing that the City's articulated reason for its actions is pretext for discrimination. To meet his burden in establishing pretext, Peña must show that the City's articulated reason (1) had no basis in fact; (2) did not actually motivate the City's actions; or (3) was insufficient to warrant the action taken by the City. First, there is no dispute that Peña was out on medical leave for over two months and that Bow wanted him to submit to an IME before returning from the leave. Thus, the City's actions were based in fact. Second, Peña does not seem to challenge that, if the City was justified in requiring him to attend an IME, his refusal to do so amounts to insubordination sufficient to warrant the City's actions. Peña's argument appears to be that the City's actions were actually motivated by the fact that Peña had complained about discrimination in the workplace.

Peña has not shown that the City's articulated reason for refusing to allow him to return to work and for terminating him did not actually motivate the City's actions. To make such a showing, Peña has the burden of establishing "that the sheer weight of the circumstantial evidence of discrimination makes it more likely than not that the employer's explanation is a pretext, or coverup." *Abdulnour*, 502 F.3d at 503 (citation and quotation

marks omitted). First, Peña points to the fact that a co-worker made comments about Mexicans to him in 2008, and that he complained to supervisors about the comments. However, the City remedied the problem by requiring Peña's co-workers to attend training, and Peña told Bow in 2008 that the problem was resolved. Peña worked until 2013, for an additional five years, before he was terminated. It is not "more likely than not" that the discrimination Peña suffered in 2008 (which was remedied by the City) played a role in the City's decision to require Peña undergo an IME. Nor is it "more likely than not" that the past discrimination played a role in Bow's 2013 decisions.

Second, Peña points to his deposition testimony that he suffered national origin and race discrimination in 2013 and complained about it. But his testimony does not support that argument. Peña's deposition testimony establishes that he may have complained about "harassment," "discrimination," "retaliation," and "stress"; however, there is no testimony establishing that Peña suffered this treatment because of his national origin or race. None of the evidence proffered by Peña supports the view that he was discriminated against because of his national origin or race or that he made the City aware that he was suffering such discrimination. Rather, Peña complained that he was not being allowed overtime or permitted to mow the grass/snow plow, etc. Peña has not pointed to any circumstantial evidence to show that this occurred because he is Mexican.

Because Peña has not met his burden in showing that the City's articulated reason for terminating him is pretext for discrimination, summary judgment will be granted to the City on the Title VII claims.

-24-

**IV. CONCLUSION**

For the reasons stated above, the City's motion for summary judgment is GRANTED.  This case is DISMISSED.

IT IS SO ORDERED.

Dated:  September 29, 2015

s/George Caram Steeh
GEORGE CARAM STEEH
UNITED STATES DISTRICT JUDGE

---

CERTIFICATE OF SERVICE

Copies of this Order were served upon attorneys of record on
September 29, 2015, by electronic and/or ordinary mail.

s/Marcia Beauchemin
Deputy Clerk

---